Christopher Roberts(#001351995)
Attorney at Law
7 Glenwood Avenue
Suite 401
East Orange, New Jersey 07017
(973)-673-0600
Attorney(s) for Plaintiff


## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

Byron Marshall,

     Plaintiff,

                          Civil Action No:

vs.

                           **COMPLAINT AND JURY DEMAND**

New York Football Giants, Inc. and
Joann Lamneck, John Does (1-10),
Jane Does (1-10), ABC Corp. (1-10).
Jointly, Severally, Individually
     Defendants.

---

Plaintiff Byron Marshall residing and is domiciled in the City of Franklin, State of
Louisiana, St. Mary Parish for his Complaint against Defendant New York Football Giants, Inc.
and Defendant Joann Lamneck, John Does (1-10), Jane Does (1-10) and ABC Corp. (1-10), state
as follows:

JURISDICTION AND VENUE

1. Plaintiff Byron Marshall (hereinafter "Plaintiff") is an individual residing and domiciled in Franklin, Louisiana.

2. Defendant New York Football Giants, Inc (hereinafter "The Giants"). is a professional U.S. American football team based in the New York/ New Jersey metropolitan area. The Giants compete in the National Football League (NFL) with a facility located at 1925 Giants Drive, East Rutherford, New Jersey in Bergen County and is believed to be incorporated in New Jersey.

3. Defendant Joann Lamneck (hereinafter "Lamneck") was during and at all times set forth in this Complaint was the agent, servant, and employee of the Defendant New York Football Giants, Inc. and acted for all pertinent purposes within the scope and course of her employment with the Defendant New York Football Giants, Inc.

4. Defendant Joann Lamneck was during and at all times set forth in the Complaint acted in her individual capacity too.

5. Defendants John Does (1-10), Jane Does (1-10), and ABC Corp. (1-10) were during and at all times set forth in this Complaint that they were the agents, servants, and employees of the Defendant New York Football Giants, Inc. and acted for all pertinent purposes within the scope and course of their employment with the Defendant New York Football Giants, Inc.

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because Plaintiff is domiciled in the State of Louisiana and Defendants are domiciled in the State of New Jersey.

7. The amount in controversy is greater than $75,000.00.

8. Venue is proper under 28 U.S.C. § 1391(a) in the United States District of New Jersey because Defendants are located in this District and all events giving rise to the action

occurred in this District. The entirety of Defendants' actions took place in Bergen County, New Jersey on or about September 26, 2022.

9.  This Court has personal jurisdiction over Defendants because Defendant Lamneck, as an employee for the Defendant Giants and within the scope of her duties, expressly directed her defamatory statements about Plaintiff to a third party at the Meadowlands Complex located in East Rutherford, New Jersey.

(FACTS COMMON TO ALL CAUSES OF ACTION)

10. Plaintiff Byron Marshall, who served as U.S. Military Department of Defense (DOD) Contractor supporting the Iraq War, is the younger brother of former Giants player Leonard Marshall whose prolific football career spanned from 1983 to 1992 and was a significant contributor to the Giants winning 2 Super Bowl Championships.

11. Plaintiff Byron Marshall was a teenager when his older brother Leonard Marshall was drafted by the Giants in or about 1983. Plaintiff as the younger brother of Leonard Marshall was able to visit his brother and spend a great deal of time with him which resulted in Plaintiff interacting with the Giants organization members, with other Giants' players and Giants coaches. As a result, Plaintiff was able to bond and socialize with multiple players, coaches and administrators over those years and has established lifelong friendships and acquaintanceships, with those past Giants players and coaches from the 1980's and 1990's Giants teams. Upon information and belief, some Giants former players treated Plaintiff or referred to him as an "honorary teammate." However, Plaintiff is a private figure, having never played for the Giants or in the NFL, and is not a public figure like his brother Leonard Marshall and Leonard Marshall's Giants teammates. As, previously mentioned, Plaintiff's

brother, Leonard Marshall, had a prolific football playing career with the Giants which culminated in 2 Super Bowl victories for the Giants in the 1986 and 1990 NFL seasons. As a result of having a prolific playing career, the Giants bestowed a prestigious honor of Plaintiff's brother, Leonard Marshall, by inducting him into the Giants Ring of Honor which upon information and belief, is the most prestigious honor that can be given by the Giants to a Giants player, coach or member of the organization. Upon information and belief, in 2022, approximately only 33 Giants players in Giants history had ever received such an honor. In 2022, the Giants bestowed this honor on Plaintiff's brother Leonard Marshall which, upon information and belief, is celebrated before Giants fans at MetLife Stadium with a Ring of Honor induction ceremony which is to be held at halftime of a Giants regular season game.  Also, upon information and belief, in connection with the Ring of Honor ceremony, the Giants organization would be sponsoring multiple celebratory events during the week leading up to the Ring of Honor ceremony. Also, upon information and belief, the Giants players who were being inducted into the Ring of Honor were having their own sponsored celebratory events during the week leading up to the Ring of Honor ceremony.

12. Upon information and belief, the Giants chose the September 26, 2022 home game at Metlife Stadium with its rival the Dallas Cowboys to have the halftime Ring of Honor induction ceremony.  The Giants former players to be inducted into the Ring of Honor, were Plaintiff's brother Leonard Marshall, Ottis Anderson, Joe Morris, Rodney Hampton, Jimmy Patton, Kyle Rote.  Athletic Trainer Ronnie Barnes was also inducted.

13. Upon information and belief, when Plaintiff's brother Leonard Marshall learned of his induction, Leonard Marshall texted Plaintiff stating " **Leonard A. Marshall** [text heading]

*You need to be here with us little brother. It's important that you're right beside me/us.*
*LMJ.*"and said text was concluded with a heart emoji, 100 emoji, flexing bicep emoji and
prayer hands emoji and the avatar contained a picture of Plaintiff's brother Leonard
Marshall and Leonard Marshall's wife, Lisa.  Also, Giants former player Jarrod Bunch also
texted Plaintiff to verify that Plaintiff was attending the Ring of Honor Ceremony. Other
Giants former players such as inductee Rodney Hampton, Chris Calloway, Lewis Tillman,
Bobby Johnson, Odessa Turner, Byron Hunt, Lawrence Taylor, Myron Guyton
communicated with Plaintiff regarding as to whether he was attending the September 26,
2022 Ring of Honor ceremony and/or later on inquired about the rumored allegations as
for his absence at the September 26, 2022 Ring of Honor ceremony.

14. Upon information and belief, over the years since Leonard Marshall's playing days,
Plaintiff and Plaintiff's brother Leonard Marshall's relationship had become strained but
Leonard Marshall still invited Plaintiff to the Ring of Honor ceremony. Over the years, in
addition to the aforementioned former players in the previous paragraph #5, Plaintiff
maintained relationships and/or acquaintanceships with Giants former players such as
Rodney Hampton, Lance Smith, Maurice Carthon, Ed McCaffrey and Steve DeOssie.

15. Upon information and belief, Plaintiff's brother Lenoard Marshall informed Defendant
Joann Lamneck, who is the Director of Alumni Relations for the Giants, as to who his
invitees were and Plaintiff was among those invitees. Defendant Lamneck spoke with
Plaintiff on his cell phone while Plaintiff was at work to inform him of the Ring of Honor
festivities and to inform him of the accommodations for the week leading up to Giants -
Cowboys September 26, 2022 game and the halftime Ringer of Honor ceremony. At some
point during the call, the call dropped. Upon information and belief, Plaintiff learned that

Defendant Lamneck interpreted the dropped call as Plaitiff hanging up on her and that as being disrespectful. After speaking with Defendant Lamneck, Plaintiff put in his request at his job for time off for the week of September 25, 2022 so he could attend the festivities and the Giants-Cowboys September 26, 2022 game.

16. Upon information and belief, Plaintiff's brother Leonard Marshall subsequently retracted the invitation to the Ringer of Honor Ceremony but told Plaintiff that if he still wants to attend then Plaintiff would have to arrange and pay for his own travel and hotel accommodations and get his own ticket to the Giants-Cowboys September 26, 2022 game. On or about September 19, 2022, Plaintiff's brother Leonard Marshall texted Plaintiff stating that "…..*You caused a bunch of bullshit in my houses two weeks ago with Joann Lamneck and The Giants front office. Didn't she tell you that you were not welcome to attend the game and security will escort off the property? Now you want me to send me a message requesting me to pick you up, supply a ticket, and provide you with a place to stay. I cannot provide you with either transportation, a game ticket, and a place to stay for the weekend. YOU ARE ON YOUR OWN. Go to work or get your buddies to take care of you. Also, you owe Lisa an apology and not via text."* Plaintiff informed his brother Leonard Marshall that he was okay with having to make his own accommodations and arrangements to attend the festivities and the game.

17. Upon information and belief, following his conversation with Leonard Marshall, Plaintiff contacted his friend Lance Smith, a former St. Louis/Phoenix Cardinals player and former Giants player. Mr. Smith played in the NFL for approximately 12 seasons, from 1985-1996, 9 with the Cardinals (1985-1993) and 3 with the Giants (1994-1996).   Plaintiff inquired of Mr. Smith as to whether he (Mr. Smith) could get a ticket to the Giants-

Cowboys September 26, 2022 game for him (Plaintiff). Given the Mr. Smith and Plaintiff have been friends for over 20 plus years, Mr. Smith agreed to get a ticket for Plaintiff and gifted Plaintiff a ticket to the Giants-Cowboys September 26, 2022 game. Also, Plaintiff's good friend and Giants Ring of Honor Inductee Rodney Hampton offered Plaintiff a seat on his (Rodney Hampton) personal bus which was to transport Rodney Hampton's family and friends from the Marriot Hotel at the Meadowlands to Metlife Stadium. Plaintiff paid Rodney Hampton and reserved a seat on Rodney Hampton's personal bus.

18. Upon information and belief, at some point subsequent to the Plaintiff and Defendant Lamneck's phone conversation, Giants Ring of Honor Inductee Rodney Hampton informed Defendant Joann Lamneck that Plaintiff was one of his (Hampton) guests for the Ring of Honor ceremony.

19. Upon information and belief, Plaintiff was invited to a non-Giants sponsored event at Redd's Sports Bar located in Carlstadt, New Jersey. The event or party was to honor and celebrate two other Giants former players who were being inducted, Ottis Anderson, a friend of the Plaintiff and also a former St. Louis Cardinals player and Giants player, and Rodney Hampton, who is also a longtime friend of Plaintiff and who had invited Plaintiff to the event. Although the event was not a Giants sponsored event, the event attracted many Giants former players including those from 3 of their Super Bowl winning teams ('86, '90, '07 ) and  multiple famous professional athletes from other major sports such as former Heavyweight Boxing Champion Larry Holmes and former Cincinnati Reds and New York Yankees Ken Griffey, Sr. Also, personal friends and family of the honorees were present at the event such as Phil Nichols, Troy Brown, Bernard Scott and were with Plaintiff during the event. Also, former player Lance Smith was at the event and socialized with the

Plaintiff at the event. Giants former player Ottis Anderson actually introduced Plaintiff at the event as "Leonard Marshall's little brother but he was like a little brother to all of us."

20. Upon information and belief, on or about September 25, 2023, a woman called Redd's Sport Bar during the event. Bartender Michael Anderson answered the call and the woman on the phone informed Mr. Anderson that Plaintiff was at the party impersonating Leonard Marshall and that Plaintiff needed to be removed from the party. Mr. Anderson did not get the name or identity of the woman. Mr. Anderson was working downstairs and the event was taking place upstairs. So, Mr. Anderson went upstairs and told a server who was working the event about the phone call and the accusations made against Plaintiff. Mr. Anderson does not know what the server did with the information. Sometime later Plaintiff sat at the downstairs bar a for a little while had a late dinner and thereafter took an Uber ride to the Hilton Hotel at the request of Mr. Hampton, to deliver a jacket that left behind by another guest that had attended the event. Plaintiff then returned to his hotel, The Meadowlands Marriot.  Mr. Anderson stated that he did not see Plaintiff engage in any fight, did not witness any incident upstairs where the event was held and no police were called to the bar that night for any reason.

21. Upon information and belief, according to statements of witnesses who attended the September 25, 2022 event at Redd's Sports Bar, Plaintiff did not impersonate his brother Leonard Marshall, did not engage in any fight and was not arrested at the event. Those witnesses are Lance Smith, Phil Nicols and Troy Brown. Witness Phil Nichols, who is a close friend of Ottis Anderson, actually stated that the Plaintiff was a perfect gentleman during the event. Although Mr. Michael Anderson, the bartender, could not identify the woman who called Redd's Sports Bar that night on September 25, 2022, this marked the

first incident where someone made a false statement about the Plaintiff because Plaintiff did not impersonate his brother Leonard Marshall.

22. Upon information and belief, Plaintiff contends when he first met Defendant Lamneck in person on September 26, 2022 around 2:00 pm in the hotel lobby when Plaintiff and Lawrence Taylor had entered into the lobby together at the Hilton Hotel. Defendant Lamneck had asked Plaintiff's sister who was with Lawrence Taylor and Plaintiff's sister said that was her brother Byron. Plaintiff saw Defendant Lamneck watching Plaintiff conversating with other former Giants players, Jarrod Bunch and Odessa Turner in the lobby. Defendant Lamneck approached Plaintiff and Plaintiff extended his hand to Defendant Lamneck and shook her hand. After the handshake Defendant Lamneck walked away, Plaintiff learned that Defendant Lamneck immediately pulled out a sanitizing wipe to clean her hand, which made Plaintiff feel insulted because she appeared to imply that Plaintiff was dirty or had germs. Although, Plaintiff did not see Defendant Lamneck pull out a sanitizing wipe when shaking hands with others in the lobby. Plaintiff's sister and Plaintiff's friend Bernard Scott witnessed Defendant Lamneck pull out the sanitizing wipe after shaking Plaintiff's hand.

23. Upon information and belief, on September 26, 2022, the day of the game between the Giants and Dallas Cowboys, Lance Smith gifted a game ticket to the Plaintiff around 3pm. Plaintiff was invited to the Ring of Honor ceremony by inductee Rodney Hampton. So, Plaintiff had a game ticket, a reserved seat on Rodney Hampton's personal bus to MettLife Stadium and an invitation to the Ring of Honor ceremony as a guest of Rodney Hampton. Sometime later that afternoon, Plaintiff approached the bus to join others who were boarding Rodney Hampton's personal bus, Defendant Joann Lamneck approached him and

began questioning Plaintiff and accused Plaintiff of a being in a fight at a local bar the night before and alleged that Plaintiff was arrested. Plaintiff denied her allegations.

24. Subsequently, Defendant Lamneck approached Lance Smith who still had Plaintiff's game ticket and according to Lance Smith's December 30, 2022 statement to Plaintiff's Investigator, Defendant Joann Lamneck told Lance Smith that Plaintiff had been involved in a fight at local bar the night before and was impersonating his brother Leonard Marshall and as a result of what Defendant Joann Lamneck told him (Lance Smith), Defendant Lamneck's defamatory comments had an immediate effect on Lance Smith in that he gave the ticket back to Defendant Lamneck immediately after her defamatory comments without any resistance and essentially separating himself from the Plaintiff and keeping Plaintiff from the game and the ceremony. The affirmative act of Lance Smith's return of the ticket to Defendant Lamneck shows that Lance Smith looked at Plaintiff in a lesser light and was deterred from attending the game and the ceremony with Plaintiff as a result of Defendant Lamneck's defamatory comments. In his statement to a Private Investigator, Lance Smith began his statement calling Plaintiff a friend for 20 something years, and then after talking to Defendant Lamneck, Lance Smith referred to Plaintiff as 'some guy." According to the Lance Smith's statement, the following occurred:

> MR. FRACELLA: And what's your relationship with Byron and how did you come to meet him?

> MR. SMITH: He's a friend of mine and I've been knowing him for like twenty about twenty-some years and we just been good friends.

> ———————

> MR. FRACELLA: Did she make any comment or accusation that Byron was in a fight at Red's the night before?

*MR. SMITH: Yes, she sure did. She said that she heard that Byron had got ina fight the night before and she  heard that he was out acting like he was Leonard and it was a mess. But that was – that was a lie, because Byron was with us the whole night, then we left and he left  with a lady and went back to his  hotel. So whatever she was saying, she  got that probably from her brother – from Byron's brother. he said that and  that's why she just repeated what he said.*

*MR. FRACELLA: Did -- did Joann ask you to give the ticket back or you took it upon yourself to take it  back?*

*MR. SMITH:      Well, I took upon myself to take it back because I'm not gonna get in the middle.      The Giants been good -- was good to me in my career and I'm not gonna get in the middle of a family dispute because some guy wants to go to the game, and so that's the reason why I took it back. Because I got a great relationship with the Giants, so I'm not gonna mess it up over somebody else's  issues.* **(See Exhibit A- Transcript of Interview of Lance Smith)**

This September 26, 2022 incident marked the second incident in as many days, in which Plaintiff was falsely accused of being involved in fight at a local bar and and/or impersonating his brother. This time Defendant Joann Lamneck made the false statements to Lance Smith who had initially obtained a game ticket for Plaintiff and then gave it to Defendant Lamneck immediately after her false statements about Plaintiff. Also, according to Plaintiff's Investigator's Open Public Records Act search, the Carlstadt police was never called to Redd's Sports Bar on September 25, 2022 and no arrests were made at Redd's Sports Bar on September 25, 2022.

25. Upon information and belief, even after retrieving the game ticket from Lance Smith, Defendant Lamneck next approached Giants former player Myron Guyton, to inquire whether he (Guyton) had obtained a ticket for Plaintiff. Mr. Guyton informed Defendant Lamneck that he did not have a ticket for Plaintiff. Plaintiff has reason to believe that

Defendant Lamneck made the same defamatory statements about Plaintiff to Myron Guyton.

26. Upon information and belief, after Defendant Lamneck had approached Lance Smith with the purpose of taking away Plaintiff's ticket to the game.  As Plaintiff was walking out the hotel door, Plaintiff said to Defendant Lamneck, "excuse me Madam, can I ask why you took my ticket? Defendant Lamenck responded to Plaintiff by saying that "you don't need to ask me another question, come talk to these State Troopers and don't you get on either one of these buses."   Defendant Lamneck accused Plaintiff of being involved in a brawl/fight at a local bar and specifically stated that Plaintiff had been arrested for the brawl/fight. Defendant Lameck prohibited Plaintiff from boarding the bus in front of Plaintiff's family and friends and acquaintances. Defendant Lamneck's false allegations caused Plaintiff to be humiliated and embarrassed. Defendant Lamneck's directive that Plaintiff to talk to the New Jersey State Police who were on site to escort the buses to MetLife Stadium and implicitly telling him that he would be arrested if he tried to enter the stadium and that inference put Plaintiff fear of being arrested if he tried to go to the game.

27. Upon information and belief, also on September 26, 2022, Plaintiff was informed by the wife of Rodney Hampton that Defendant Lamneck had approached her on Rodney Hampton's personal bus to the game stating that Plaintiff had been arrested for a brawl/fight and was looking for Plaintiff in order to see if he was on the bus and remove him from the bus.

28. Upon information and belief, defendant Lamneck knew that the statements about Plaintiff were false but nonetheless conveyed them to multiple people. Defendant Lamneck did not check the veracity of the allegations before communicating them to third parties. Defendant

Lamneck knew that these false allegations would cause Plaintiff embarrassment, damage to his reputation, prevent him from attending the game and the Ringer of Honor ceremony, put him in a false light in front of Plaintiff's family and friends. Defendant Lamneck perform the aforementioned acts as an employee of the Giants. Plaintiff has reason to believe that Defendant Lamneck excessively published the false defamatory statements about Plaintiff to multiple individuals.

29. Upon information and belief, Defendant Lamneck never asked Plaintiff whether the false allegations were true. Also, Defendant Lamneck never asked Lance Smith whether the false allegations were true. Also, Plaintiff has reason to believe that Defendant Lamneck did not ask Plaintiff's brother Leonard Marshall were the allegations true or even spoke with him about the false allegations. Also, Plaintiff's brother Leonard Marshall did not attend the event at Redd's Sports Bar on September 25, 2022. Plaintiff has reason to believe that Defendant Lamneck never conducted any basic investigation of the veracity of the false statements before stating them to Lance Smith and possibly other third parties.

30. Upon information and belief, multiple players such as Giants former player Lawrence Taylor and Byron Hunt reached out to Plaintiff to discuss Defendant Lamneck's allegations and his absence from the ceremony.

31. Upon information and belief, Plaintiff suffered embarrassment, damage to his reputation, humiliation, and fear for his safety after being warned that the NJ State Police could potentially arrest him if he attended the game.

32. Upon information and belief, Plaintiff has been damaged economically because of said actions because Plaintiff would arrange appearances for former players and since said

tortious and discriminatory conduct by Defendants, Plaintiff has not been able to arrange such appearances for former players.

33. Upon information and belief, Plaintiff sought medical treatment for the stress he endured because of Defendant Lamneck's actions.


COUNT ONE

(DEFAMATION PER SE, SLANDER PER SE)

34. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if stated fully herein.

35. Upon information and belief, New Jersey classifies a statement as 'defamatory per se' if it falls into one of these four categories. "Slander per se exists when one accuses another: '(1) of having committed a criminal offense, (2) of having a loathsome disease, (3) of engaging in conduct or having a condition or trait incompatible with his or her business, or (4) of having engaged in serious sexual misconduct.'" **Too Much Media, LLC v. Hale, 413 N.J. Super. 135, 167 (App. Div. 2010)**

36. Upon information and belief, a defamatory statement is one that is false and 1) injures another person's reputation; or 2) subjects the person to hatred, contempt or ridicule; or 3) causes others to lose good will or confidence in that person.  A defamatory statement "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  To prove defamation a plaintiff must establish damages and that the defendant "(1) made a defamatory statement of fact 2) concerning the plaintiff (3) which was false and (4) which was communicated to

a person or persons other than the plaintiff." The law of defamation distinguishes between public figures and private persons." Fault in private defamation is proven by a negligence standard.

37. Defendant Lamneck made multiple defamatory statements concerning the Plaintiff such as stating that Plaintiff was in a bar fight the night before and that Plaintiff was impersonating his brother Leonard Marshall, that Plaintiff was arrested for the fight at the bar.

38. Upon information and belief, Defendant Lamneck made the following defamatory statements of fact about Plaintiff included but not limited to the following:

- *Byron had got in a fight the night before*
- *Byron was out acting like he was   Leonard and it was  a mess.*
- *Byron had gotten arrested at the bar for fighting.*

39. Upon information and belief, Plaintiff did not get into a fight on the night of September 25, 2022 at Redd's Sports Bar. Plaintiff did not impersonate his brother Leonard Marshall. Plaintiff did not get arrested for any fight on September 25, 2022 at Redd's Sports Bar. All of statements Defendant Lamneck made about Plaintiff's conduct at Redd's Sports Bar on September 25, 2022 in her conversations with Lance Smith and other third parties were false.

40. Defendant Lamneck's false statement that Plaintiff had impersonated his famous brother Leonard Marhsall alleged that Plaintiff committed the crime of fraud. Under N.J.S.A. 2C:21-17, if you impersonate another individual (or assume a false identity) and do an act while pretending to be that assumed character (or with that false identity) for the purpose

15

of obtaining a benefit for yourself or others or to injure or defraud others, you can be convicted of identity theft.

41. Defendant Lamneck's false statement that Plaintiff had gotten into a fight at local bar the night before is charging Plaintiff with committing the crime of assault under N.J.S.A. 2C:12-1. Upon information and belief, any type of assault in New Jersey is considered serious, and even a simple assault charge carries a penalty of up to six months in jail and a maximum fine of $1,000 for those convicted.

42. Upon information and belief, Defendant Lamneck's false statements about Plaintiff fall within the scope of defamation per se.

43. Upon information and belief, Defendant Lamneck communicated her false statements about Plaintiff to individuals other than Plaintiff including but not limited to Lance Smith, Rodney Hampton's wife and Myron Guyton.

44. Upon information and belief, Defendant Lamneck's false statements about Plaintiff subjected him to contempt, ridicule, and damage to his reputation and deterred third person(s) from dealing with him. Clearly, Lance Smith's returning the ticket to the game clearly shows that at the very least that Lance Smith was deterred from dealing with Plaintiff and wanted no part in dealing with the Plaintiff or at the very least even attending the game with Plaintiff. As previously stated, Lance Smith's statement to the Investigator, Lance Smith began his statement calling Plaintiff a friend for 20 something years, and then after talking to Defendant Lamneck, Lance Smith referred to Plaintiff as 'some guy." Such a transition from a friend for 20 something years to "some guy" shows that Lance Smith's view of Plaintiff had diminished. Upon information and belief, Lance Smith, Plaintiff's friend for over 20 years did not even bother to defend his friend to Defendant Lamneck in

fear of retaliation from the Giants even though Mr. Smith was present with the Plaintiff at the Ottis Anderson and Rodney Hampton event at Redd's Bar.

45. Upon information and belief, Defendant Lamneck made the above-described defamatory statements with actual malice, with the knowledge of their falsity, or at the very least with reckless disregard for their falsity.

46. Upon information and belief, Defendant Lamneck made these statements without justification or privilege. The critical test of the existence of the privilege is the circumstantial justification for the publication of the defamatory information. The critical elements of this test are the appropriateness of the occasion on which the defamatory information is published, the legitimacy of the interest thereby sought to be protected or promoted, and the pertinence of the receipt of that information by the recipient. **Erickson, 117 N.J. at 564.** Upon information and belief, Defendant Lamneck's conduct does not meet the prongs of the aforementioned critical test.

47. Upon information and belief, the above-described concerning Plaintiff directly injured him by diminishing his reputation.

48. Upon information and belief, it was Defendant Lamneck's expectation and intent that the defamatory statements would injure, humiliate, embarrass Plaintiff by diminishing his reputation and making his friends turn their backs on him and caused him to miss a once in a lifetime event of seeing his brother and his longtime, good friend Rodney Hampton be inducted into the Giants Ring of Honor.

49. As a direct foreseeable, and proximate result of Defendant Lamneck's discriminatory acts, Plaintiff has suffered and continues to suffer substantial losses and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress.

50. Defendant Lamneck have committed the aforementioned acts oppressively, willfully and maliciously, entitling plaintiff to an award of punitive damages.

COUNT TWO

(RESPONDEAT SUPERIOR)

51. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs and COUNT ONE  as if stated fully herein.

52. An employer is liable to a third party for torts committed by an employee when the employee acts within the scope of his or her employment.  An employee is acting within the scope of "employment if the action is "of the kind that [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the master." Di Cosala v. Kay, 91 N.J. 159 (1982)

53. Upon information and belief, Defendant Lamneck was acting as an employee of the Giants when she made her defamatory statements about Plaintiff and was acting within the scope of her duties as Director of Alumni Affairs when she was overseeing the busing accommodations to the September 26, 2022 Giants-Cowboys game which occurred at the Meadowlands Marriot on Meadowlands property. Defendant Lamneck performed said duties for the benefit of the Giants.

54. Upon information and belief Defendant New York Football Giants is liable for Defendant Lamneck's defamatory conduct.

COUNT THREE

(INVASION OF PRIVACY /FALSE LIGHT)

55. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs and COUNT ONE and COUNT TWO as if stated fully herein.

56. Defendants Jann Lamneck, in committing the above-described acts, intended to and did defame, slander, libel per se the character of the Plaintiff and place him in a false light per se and invasion of privacy. Defendant Lamneck falsely communicated to a third party including but not limited to Lance Smith that Plaintiff had been in a brawl/fight at a local bar, was impersonating Leonard Marshall and was arrested for the fight.   Defendant Lamneck acted with reckless disregard in defaming Plaintiff's character and reputation and placing him in a false

57.      As a direct result of the outrageous reckless acts and omissions, conduct by Defendant Lamneck, Plaintiff became distraught, embarrassed, and suffered damage to her reputation and missed a once in a lifetime opportunity to witness his brother Leonard Marshall and his good friend Rodney Hampton be inducted into the Giants Ring of Honor.

58.      Upon information or belief, there is no intra-corporate privilege to publish defamatory statements. Defendants Lamneck and the Giants abused any qualified privilege if it existed, by Defendant Lamneck's excessive publication that Plaintiff was in a fight at a local bar, impersonating his brother Leonard Marshall and was arrested for the fight.

COUNT FOUR

(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

59. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs and COUNT ONE , COUNT TWO and COUNT THREE as if stated fully herein.

60. Plaintiff refers to the allegations set forth, above and by such reference repleads and incorporates them as though fully set forth herein.

61. Defendants in committing the above-described acts, intended to and did inflict emotional distress upon Plaintiff. Defendants Lamneck and the Giants acted with a reckless disregard of the probability of causing Plaintiff emotional distress.

62. As a direct result of the outrageous acts and omissions, conduct and discrimination, Plaintiff became physically distraught and suffered severe emotional distress.

COUNT FIVE

(NEW JERSEY LAW AGAINST DISCRIMINATION N.J.S.A. 10:5-1 et seq.)

63. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs and COUNT ONE, COUNT TWO, COUNT THREE and COUNT FOUR as if stated fully herein.

64. For non-public entities such as the Defendant New York Football Giants, the existence of broad public solicitation is a principal characteristic of public solicitation for purposes of

the prohibition, in the Law Against Discrimination (LAD), of discrimination in relation to public accommodation. N.J.S.A. 10:5-5(l); 10:5-12(f)(1).

65. Upon information and belief, the New Jersey Sports and Exposition Authority (NJSEA) holds the land lease for and provides for the ongoing operations for the Metlife Sports Complex which houses the Defendant Giants' games at Metlife Stadium which is a public accommodation under the N.J.S.A. 10:5-1 et seq.

66. In places of public accommodation, under N.J.S.A. 10:5-4, all persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation without discrimination because of race and subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

67. Defendants' conduct as alleged in this complaint constitutes an unlawful denial of a public accommodation based on race in violation of the New Jersey Law Against Discrimination 10:5-1 et seq.

68. Plaintiff Byron Marshall is a Black man and upon information and upon information and belief, Defendant Joanne Lamneck is a White woman.

69. Upon information and belief, at least two Black former Giants players have had similar incidents in which Defendant Lamneck either banned or threatened to ban at least one of them from Giants' facilities, festivities. Those former players have expressed to Plaintiff that Defendant Lamneck actions towards them appeared to be racially motivated. Furthermore, Defendant Lamneck 's action resulted in Plaintiff being banned from the September 26, 2022 game, being prohibited from entering MetLife Stadium on September 26, 2022 being implicitly threatened with arrest by the NJ State Troopers if he tried to enter MetLife Stadium.

70. Plaintiff acknowledges that he is not a former Giants player, but he does contend that Defendant Lamneck's excessive dissemination of false allegations about him and her ardent and overzealous attempts to retrieve the September 26, 2023 game ticket and

implicitly threatening him with being arrested by the NJ State Troopers appears to be racially motivated because she appeared to treat him as inferior even though the parties met for the first time on September 26, 2022.

71. Plaintiff contends that Defendant Lamneck's false allegations about Plaintiff engaging in criminal behavior was her way to demonized Plaintiff and discourage others in the Giants' community from associating with Plaintiff. Even Defendant Lamneck's action of sanitizing her hands only after shaking Plaintiff's hand gave Plaintiff the feeling that Defendant Lamneck had a discriminatory animus towards him. Defendant Lamneck aided and abetted the Defendant Giants in the committing discriminatory acts against Plaintiff.

72. Plaintiff contends that his being a non-player along with his race were factors that led Defendant Lamneck to engage in tortious and discriminatory actions against him.

73. As a direct, foreseeable and proximate result of defendants' discriminatory acts, Plaintiff has suffered and continues to suffer prospective losses in earnings and benefits, and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, discomfort, pain and suffering

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for Judgment against all Defendants the Giants, Joann Lamneck, John Does (1-10), Jane Does (1-10), ABC Corp. (1-10) individually, jointly, severally and each of them for all aforementioned claims, for the following injunctive and monetary relief as follows:

1. Awarding compensatory damages in an amount to be determined;

2. Awarding punitive damages in an amount to be determined;

3. Awarding damages for pain and suffering in an amount to be determined;

4. Attorney fees and costs, plus interest;

5. An order compelling Defendants Giants and Joann Lamneck to take prompt appropriate and effective corrective measures, including those that effect all supervisors and personnel, to prevent the conduct complained of in this Complaint by any employee, agent, and/or representative toward any member of the Giants community.

6. An order enjoining Defendants Giants and Joann Lamneck from taking retaliatory action of any type against any Giants employees past and present for reporting to or objecting to Defendants Giants and Joann Lamneck's improper activities, policies, and/or practices believed to be in violation of contract, law, rule, and/or regulation promulgated pursuant to law.

7. Any other prospective injunctive relief that the Court deems just and appropriate

8. For such other and further relief as the Court deems proper.


By: _____
Christopher C. Roberts, Esq.

Dated: May 10, 2023

DESIGNATION OF TRIAL COUNSEL

Christopher C. Roberts, Esq. is hereby designated as trial counsel.

By:_____
    Christopher C. Roberts, Esq.

Dated: May 10, 2023

JURY DEMAND

Plaintiff demands a jury trial on all triable issues.

By:_____
    Christopher C. Roberts, Esq.

Dated: May 10, 2023

CERTIFICATION

I hereby certify that the matter in controversy herein is not the subject of any other court Arbitration or administrative proceeding.

By:_____
    Christopher C. Roberts, Esq.

Dated: May 10, 2023

# EXHIBIT A

1

1

2

3    - - - - - + + - - - - - - - -

4

     IN THE MATTER OF:

5

6    BYRON MARSHALL

7

         VS

8

9    NEW YORK FOOTBALL
     GIANTS, INC.

10

11   - - - - - + - - - - - - - - -

12

13                    AUDIO RECORDED

14

15                     INTERVIEW

16                        OF

17

18                   LANCE SMITH

19                        BY

20

21              RICHARD FRACELLA

22                        ON

23

24              DECEMBER 30, 2022

25   11:01 A.M. - 11:07 A.M.

2

1          MR. FRACELLA:  Mr. Smith, my name
2      is Richard Fracella.  I'm a private
3      investigator working on behalf of Attorney
4      Christopher Roberts and his client, Byron
5      Marshall.
6          I would like to take a formal audio
7      recorded statement from you concerning any
8      observations you made, conversations you
9      may have had or overheard with Byron
10     Marshall on or about September 25th and
11     September 26th, 2022.
12         Do you have -- do I have your
13     permission to record your statement?
14         MR. SMITH:  Yes.
15         MR. FRACELLA:  Today's date is
16     Friday, December 30th, 2022.  The time is
17     11:01 a.m.
18         What's your full name?
19         MR. SMITH:  Lance Smith.
20         MR. FRACELLA:  And how old are you,
21     sir?
22         MR. SMITH:  I'm fifty-nine.  I'll
23     be sixty January 1st.
24         MR. FRACELLA:  Okay.  Happy
25     Birthday.

3

1          Where do you reside at?

2          MR. SMITH:  I reside in Houston,

3     Texas.

4          MR. FRACELLA:  And do you know

5     Byron Marshall?

6          MR. SMITH:  Yes, I sure do.

7          MR. FRACELLA:  How long have you

8     known Byron?

9          MR. SMITH:  Probably about

10    twenty-five years.

11         MR. FRACELLA:  And what's your

12    relationship with Byron and how did you

13    come to meet him?

14         MR. SMITH:  He's a friend of mine

15    and I've been knowing him for like twenty

16    -- about twenty-some years and we just

17    been good friends.

18         MR. FRACELLA:  Did you provide

19    Byron with a ticket for the New York

20    Giants football game that was to be played

21    on September 26th, 2022?

22         MR. SMITH:  Yes, I sure did.

23         MR. FRACELLA:  Do you recall where

24    you were when you gave Byron a ticket for

25    that game?

4

1           MR. SMITH:  I was at the Hilton

2       Meadowlands at Giants Stadium -- right

3       across from Giants Stadium.

4           MR. FRACELLA:  What was the

5       significance of that football game that

6       you provided Byron a ticket for?

7           MR. SMITH:  To go to -- they had

8       the Ring of Honor, they had a bunch of

9       guys going in the Ring of Honor Giants

10      Stadium Monday night against the Dallas

11      Cowboys and so he wanted to go to the game

12      and I got a ticket for him to go to the

13      game from the New York Giants.

14          MR. FRACELLA:  Did you attend the

15      party for some of the Ring of Honor

16      recipients?  It was held on Sunday,

17      September 25th, 2022, at Red's Sports Bar

18      in Carlstadt, New Jersey.

19          MR. SMITH:  Yes, I sure did.

20          MR. FRACELLA:  Do you recall what

21      time you got to the party?

22          MR. SMITH:  I think I got there

23      right around 10, 10:00 p.m. that night.

24      And then I end up leaving there probably

25      at around 1:30 or 2:00 o'clock that

1     morning.

2              MR. FRACELLA:  Do you recall seeing

3     Byron Marshall at Red's that night?

4              MR. SMITH:  Yes, I sure do.

5              MR. FRACELLA:  Did you see Byron

6     get into a fight or any type of

7     confrontation, physical confrontation,

8     with anyone at Red's that night?

9              MR. SMITH:  No, I did not.

10             MR. FRACELLA:  Did you see Byron

11    get arrested or anyone get arrested at

12    Red's that night?

13             MR. SMITH:  No, I sure didn't.

14             MR. FRACELLA:  And you were there

15    approximately until 1:30, 2:00 a.m.?

16             MR. SMITH:  Yes.

17             MR. FRACELLA:  Was Byron still

18    there when you left at 1:30, 2:00 a.m.?

19             MR. SMITH:  Well, no, me and him

20    pretty much walked out the same time and I

21    was in the valet waiting on my car to get

22    here and I saw Byron get in a car with

23    some lady right before my car got pulled

24    up.

25             MR. FRACELLA:  Do you know if Byron

6

1    attended the football game on Monday,

2    September 26th?

3              MR. SMITH:  He did not.

4              MR. FRACELLA:  And can you explain

5    -- you did give him a ticket for that

6    game, though, correct?

7              MR. SMITH:  Yes.  He didn't return

8    the -- come to the game because once I

9    gave him a ticket and then I walked

10   downstairs the day before -- the day of

11   the game, Joann from the New York Giants

12   said he wasn't allowed to come to the game

13   because he was acting like he was Leonard

14   Marshall and he was -- he wasn't allowed

15   to go -- to come to the game -- come to

16   Giants Stadium pretty much.

17             MR. FRACELLA:  Excuse me one

18   second, I have to cough.  Sorry.

19             (Brief pause.)

20             MR. FRACELLA:  So do you know

21   Joann's last name?

22             MR. SMITH:  I don't know -- yeah,

23   Joann --

24             (Dog barking.)

25             MR. SMITH:  -- last name.  She

1    works for the Giants.

2            MR. FRACELLA:  And did you have a

3    conversation with Joann about Byron going

4    to the game?

5            MR. SMITH:  Yeah, she said he

6    wasn't allowed to go to the game and --

7    because he had got in a fight the night

8    before and he was in a situation walking

9    around telling everybody he was Leonard

10   Marshall.

11           And so in the meantime I decided to

12   take the ticket back from Byron and give

13   it back to Joann because she gave me the

14   ticket.  And then when she said all that,

15   I wasn't going to get in the middle of a

16   family dispute about who's supposed to be

17   at the game.

18           Leonard didn't give him a ticket.

19   So he's a friend of mine, I gave him a

20   ticket, but Joann said they didn't want

21   him on the -- on the premise.

22           MR. SMITH:  Okay.  What was Joann's

23   demeanor when you had this conversation

24   with her about Byron not going to the game

25   on the bus?

1            MR. SMITH:  She was just -- she's

2    always been nice to me.  She was cordial.

3    She didn't -- she wasn't screaming and

4    being irate.  She was pretty much just

5    said was he wasn't allowed to go to the

6    game because -- and she said she really

7    didn't want to get in the middle of a

8    family dispute, but that's -- Leonard put

9    her in that situation too.

10           MR. FRACELLA:  Did she make any

11    comment or accusation that Byron was in a

12    fight at Red's the night before?

13           MR. SMITH:  Yes, she sure did.  She

14    said that she heard that Byron had got in

15    a fight the night before and she heard

16    that he was out acting like he was Leonard

17    and it was a mess.  But that was -- that

18    was a lie, because Byron was with us the

19    whole night, then we left and he left with

20    a lady and went back to his hotel.

21         So whatever she was saying, she got

22    that probably from her brother -- from

23    Byron's brother.  He said that and that's

24    why she just repeated what he said.

25           MR. FRACELLA:  And Byron's brother

1  being Leonard Marshall?

2  MR. SMITH:  That's correct.

3  MR. FRACELLA:  Did -- did Joann ask

4  you to give the ticket back or you took it

5  upon yourself to take it back?

6  MR. SMITH:  Well, I took upon

7  myself to take it back because I'm not

8  gonna get in the middle.  The Giants been

9  good -- was good to me in my career and

10  I'm not gonna get in the middle of a

11  family dispute because some guy wants to

12  go to the game, and so that's the reason

13  why I took it back.

14  Because I got a great relationship

15  with the Giants, so I'm not gonna mess it

16  up over somebody else's issues.

17  MR. FRACELLA:  I understand.  Do

18  you recall Byron's reaction when you asked

19  him for the ticket back?

20  MR. SMITH:  He was calm.  He just

21  gave me the ticket back and I didn't --

22  and then I took the ticket and gave it to

23  Joann.

24  MR. FRACELLA:  Okay.

25  Mr. Smith, is this is a true, free

10

1     and voluntary statement?

2           MR. SMITH:  Yes, it is.

3           MR. FRACELLA:  Has any pressure or

4     coercion been used against you to give

5     this statement?

6           MR. SMITH:  No.

7           MR. FRACELLA:  Okay.  That

8     concludes the statement.  The time is

9     11:07 a.m.

10          Thank you very much.  Happy New

11    Year and Happy Birthday.

12          MR. SMITH:  You too.

13          MR. FRACELLA:  Please take care.

14    Bye.

15          MR. SMITH:  Bye.

16

17          (End of recording.)

18

19

20

21

22

23

24

25

11

1                     C E R T I F I C A T E

2

3

4

5          I, TERESA CLINE, a Certified Court

6   Reporter and Notary Public of the State of New

7   Jersey, do hereby certify that the foregoing is

8   a true and accurate transcript of audio taped

9   interview to the best of my ability.

10

11          I DO FURTHER CERTIFY that I am neither

12   a relative nor employee nor attorney nor counsel

13   of any of the parties to this action, and that I

14   am neither a relative nor employee of such

15   attorney or counsel, and that I am not

16   financially interested in the action.

17

18

19   _____
     TERESA CLINE, CCR
20   NO. 30XI100174100

21

22

23

24

25